**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

KAREN S. SANTOWASSO,

        **Plaintiff,**

v.

                            **CIVIL ACTION NO. 1:04CV53**
                            **(Judge Keeley)**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

        **Defendant.**

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. §636(b)(1)(B), Rule 72(b), Federal Rules of Civil Procedure and Local Court Rule 4.01(d), on March 22, 2004, the Court referred this Social Security action to United States Magistrate John S. Kaull with directions to submit proposed findings of fact and a recommendation for disposition. On March 23, 2005, Magistrate Kaull filed his Opinion/Report and Recommendation and directed the parties, in accordance with 28 U.S.C. §636(b)(1) and Rule 6(e), Fed. R. Civ. P., to file any written objections with the Clerk of Court within ten (10) days after being served with a copy of the Opinion/Report and Recommendation.

On April 4, 2005, plaintiff, Karen S. Santowasso, through counsel, Michael Miskowiec, filed a motion requesting an extension of time in which to file objections. By order dated April 27, 2005, the Court granted the motion and extended the time for filing

### ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

objections until May 4, 2005. On May 3, 2005, counsel filed objections to the Magistrate's Opinion/Report and Recommendation.

## I. **PROCEDURAL BACKGROUND**

On January 22, 1998, Karen S. Santowasso ("Santowasso") filed an application for Disability Insurance Benefits ("DIB") alleging disability as of October 7, 1993, due to bilateral mastectomy, reduced use of right arm, bipolar disorder, depression, obsessive compulsive disorder ("OCD"), and side effects from medication. Santowasso's insured status expired in December 1999. The Commissioner denied the application initially and on reconsideration and Santowasso requested a hearing. On March 18, 1999, an Administrative Law Judge ("ALJ") conducted a hearing. On April 29, 1999, the ALJ rendered a partially favorable decision finding that Santowasso was disabled from October 5, 1993 through December 31, 1997 but not thereafter. Santowasso requested a review of the ALJ's decision.

On July 25, 2000, while her request for review was pending before the Appeals Council, Santowasso filed a second application for DIB. The Commissioner denied the second application initially and on reconsideration and Santowasso again requested a hearing. On May 16, 2002, Santowasso, represented, by counsel, testified at a

2

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

hearing in her second case. Her husband, a friend and a Vocational Expert ("VE") also testified at this hearing. Following the hearing, the ALJ referred Santowasso for a mental status examination.

On June 14, 2002, Martin Levin, M.A. ("Levin") performed the mental status examination and diagnosed Post Traumatic Stress Disorder ("PTSD"). On July 22, 2002, counsel objected to Mr. Levin's report  stating the report was: 1) from a non-treating physician; 2) not supported by acceptable testing; and 3) inconsistent with evidence of record. However, counsel did not request an additional hearing to question the doctor.

On August 22, 2002, the Appeals Council granted Santowasso's request for review of the April 29, 1999 decision, vacated the decision and remanded the case to the ALJ for further proceedings. The Appeals Council vacated and remanded the case for the following reasons:

> 1) The hearing decision cited testimony of the claimant and a VE, but the tape of that hearing could not be located for review;
>
> 2) The ALJ's decision found Santowasso's mental impairments met Listing 12.04, but the Council found "very little evidence" to support that decision; and

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

>  3) Questions were raised about Dr. Pauig's GAF
>  rating.

The Appeals Council directed the ALJ to consolidate the two cases,
to hold a *de novo* hearing, and to obtain evidence from a medical
expert to clarify the nature and severity of Santowasso's
impairments.

The ALJ determined that the May 16, 2002 hearing on the second
application and the mental status examination he had ordered
satisfied the Appeals Council's directives and, therefore, did not
schedule another hearing or obtain another evaluation. On
November 22, 2002, after review of all of the evidence of record
including the report from the mental status evaluation, the ALJ
again determined that Santowasso met Listing 12.04 for the period
from October 5, 1993 through December 31, 1997 but was not disabled
anytime thereafter.

Santowasso again requested review of the decision which the
Appeals Council denied, making the ALJ's decision the final
decision of the Commissioner. On March 22, 2004, Santowasso filed
this action seeking review of the final decision.

### ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

## II. **PLAINTIFF'S BACKGROUND**

Santowasso was forty-seven years old on the date her insured status expired. She has a high school education and twenty-three years of work experience as a repair service clerk for Bell Atlantic.

## III. **ADMINISTRATIVE FINDINGS**

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ's decision following the second hearing found that:

1. Santowasso met the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act, and was insured for benefits through the date of the decision;

2. Santowasso had not engaged in substantial gainful activity since the alleged onset of disability;

3. Santowasso has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(b);

4. Santowasso's mental impairments for the period October 5, 1993 through December 31, 1997 met the criteria of listed impairment 12.04 of Appendix 1, Subpart P, Regulations No. 4; however, as a result of medical improvement since January 1, 1998 when considered singly or in combination her impairments

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

were not of a level of severity to meet or equal the criteria of any impairment in Appendix 1;

5. Santowasso's assertions concerning her ability to work were not fully credible as they relate to the period since January 1, 1998;

6. After review of all of the evidence of record, Santowasso has the following residual functional capacity as of January 1, 1998: she can perform light work with no repetitive overhead reaching, and unskilled, low stress work that is entry level, with one-to-two step processes, routine and repetitive tasks, and working primarily with things rather than people;

7. Santowasso is unable to perform any of her past relevant work (20 CFR § 404.1565);

8. Santowasso is an "individual closely approaching advanced age" (20 CFR § 404.1563);

9. Santowasso has a "high school education" (20 CFR § 404.1564);

10. Santowasso has no transferable skills from any past relevant work (20 CFR § 404.1568);

11. Since January 1, 1998, Santowasso has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967);

12. Although her exertional and nonexertional limitations since January 1, 1998, do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.14 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform including, laundry folder, inspector/checker, sorter/grader, or assembler; and

### ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

---

13. Santowasso was under a "disability," as defined in the Social Security Act, during the period October 5, 1993 through December 31, 1997, at which time her disability ceased due to medical improvement. She has not been under a "disability," as defined in the Social Security Act, at any time since January 1, 1998, through the date of this decision (20 CFR § 404.1529(f)).

### IV.  PLAINTIFF'S OBJECTIONS

Santowasso objects to the Magistrate Judge's Opinion/Report and Recommendation alleging that the ALJ 1) failed to consider the limitations noted by a consulting psychologist prior to making his residual functional capacity determination and 2) failed to explain his reasoning regarding the weight assigned to the medical evidence regarding her limitations.

### V.  MEDICAL EVIDENCE

#### A.  December 1992 through December 1997

1.  A December 21, 1992, report from Nenita P. McIntosh, M.D., following a referral from William B. Caskey, M.D., indicating a recommendation for a right mastectomy due to multifocal intraductal carcinoma, cribriform, papillary and comedocarcinomatous types;  2.  A January 11, 1993, discharge summary from St. Francis Medical Center, Trenton New Jersey

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

indicating Santowasso had a right modified radical mastectomy and a total left mastectomy, with bilateral breast reconstruction;

3.     A March 3, 1993, operative report from Helene Fuld Medical Center, Trenton, New Jersey, indicating Santowasso underwent removal of infected left breast tissue;

4.     A March 31, 1993, operative record from Helene Fuld Medical Center, Trenton, New Jersey, indicating that due to infection and abscesses in the left anterior chest wall, Santowasso had incision and drainage of the left anterior chest wall and debridement of the wound;

5.     An April 5, 1994 operative report from Ferenc Gyimesi, M.D., indicating a laparoscopic evaluation of the abdomen and a laparotomy with lysis[1] of adhesions and left salpingo-oophorectomy[2];

6.     A December 15, 1997 report from Fairmont General Hospital and V. Russell Cox, BCD-LICSW, indicating Santowasso voluntarily admitted herself to the hospital due to anxiety and depression. Santowasso reported panic attacks with decreased sleep, pacing,

---

[1]Mobilization of an organ by division of restraining adhesions. DORLAND'S ILLUSTRATED MEDICAL ENCYCLOPEDIA, 973 (30th ed. 2003).

[2]Surgical removal of a uterine tube and ovary. *Id.* at 1481.

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

fearfulness, and phobia for a week and a half. Her chiropractor referred her to Peter Ang, M.D. who had prescribed Zoloft but she was not responding to the Zoloft. Santowasso indicated that she was a five-year breast cancer survivor and would be going for a five-year bone scan and that thinking about this was very stressful; that she had been raped by her father-in-law two years earlier; that she had been in a car accident one month earlier and suffered some shoulder injuries; and that a friend of her husband had moved in with them a month earlier, while he was building a house, and this also was very stressful.

Santowasso was admitted to the Mental Health Unit with an admitting diagnosis of rule out bipolar affective disorder versus obsessive compulsive disorder versus post-traumatic stress disorder ("PTSD"). Her stressors were listed as: status post mastectomy five years ago, raped two years ago, and recent household changes due to friend moving in for past thirty days. The social worker assessed her Global Assessment of Functioning ("GAF") at the time

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

---

of admission as only five[3]. He noted, however, that her GAF

appeared to have been as high as 80 in the past year;[4]

7.  A December 15, 1997 report from Nerine Tatham, M.D.,

psychiatrist, indicating:

> Mental Status: This shows a somewhat slender,
> very anxious appearing, 45 year old woman who
> looks slightly younger than her stated age,
> quite charming, but extremely anxious,
> extremely tangential and with some eccentric
> thought structure. She was, however, alert
> and oriented times three, able to recall three
> out of three immediately and after five
> minutes, but with some decreased
> concentration. She states that her current
> mood is tired and very anxious. She denies any
> auditory or visual hallucinations. She states
> that she believes in angels and that her
> Mother, who is now deceased, has watched over
> her and guides her. But she is a little
> sexually preoccupied and feels that after the
> alleged assault by the father-in-law, she made
> him go to church and then she had pains in her

---

[3]A GAF of 1-10 indicates **Persistent danger of hurting self or others** (*e.g.*, suicide attempts without clear expectation of death, frequently violent, manic excitement) **OR occasionally fails to maintain minimal personal hygiene** (*e.g.*, smears feces) **OR gross impairment in communication** (*e.g.*, largely incoherent or mute) Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

[4]A GAF of 71-80 indicates **If symptoms are present, they are transient and expectable reactions to psychosocial stressors** (e.g., difficulty concentrating after family argument); **no more than slight impairment in social, occupational, or school functioning** (e.g., temporarily falling behind in schoolwork). Id.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

ankle and different parts of her body related to going to church with him. She also feels that her throat gets tight, her arm aches, her back tingles, her feet get cold and sweaty and she feels flushed from time to time. She states her energy level is very decreased and that she has had insomina for the past three nights straight. No aphasia, no apyrexia. Speech is slightly pressured. Thought content is extremely circumstantial and tangential and perseverative.

ASSESSMENT: She is a rather charming, overwhelming [sic] anxious, 45 year old, married, white female with a history of breast carcinoma, status post mastectomy, Grave's disease, status post Iodine isotope and on thyroid hormone replacement and status post MVA approximately three months ago who presents now with extreme anxiety and preoccupation versus obsessive thoughts, perseverative, insomnia, denies suicidal ideation and motivated for improvement. The patient additionally has family history of bipolar disorder in one sister and also gives history of having episodes of these increased anxiety, rapid talking and insomnia since she was a child.

The diagnosis was rule out bipolar disorder, rule out obsessive compulsive disorder. She assessed her GAF as 50;[5] and

8.    A December 23, 1997 discharge summary from Fairmont General Hospital indicating Santowasso was treated with medication

---

[5]A GAF of 41-50 indicates **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). Id.

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

and therapy for eight days and that, one day after her admission, she denied any complaints. She remained anxious for several days but gradually became engaged in the therapeutic milieu with decreasing anxiety symptoms and stabilization of affect. Her diagnosis was bipolar disorder not otherwise specified. At discharge, she was only slightly anxious, with an improved mood and overall markedly improved anxiety, no suicidal or homicidal ideation and decreased obsessive thoughts. She was referred to Dr. Peter Ang, M.D., for medication management. Her GAF at the time of discharge was 67[6].

**B.  Medical Evidence January 1998 and After**

9.  A discharge summary from Fairmont General Hospital indicating hospitalization from January 30, 1998 through February 2, 1998 for a cystoscopy with placement of a right ureteral stent which indicated a marked degree of adhesions between the right ovary to the surrounding tissue including the bladder,

_____

[6]A GAF of 61 to 70 indicates **Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household)**, but generally functioning pretty well, has some meaningful interpersonal relationships**.  Id.

bowel, and retroperitoneum.  She underwent surgery in January 1998

for removal of  her right ovary and a cyst behind her bladder;

10.  An April 9, 1998, report from William Fremouw, Ph.D., at

the request of the State agency, indicating Santowasso reported

right arm lymphoedema with lymph nodes removed, swelling of her

arm, obsessive compulsive disorder and bipolar, weakness in her

right arm and problems with sleep for which she took medication,

good appetite, stable weight, not suicidal or homicidal currently

or in the past, feels weak most of the time, and has variable

moods. She also reported a hospitalization for six days in January.

Santowasso listed her medications as Depakote, Klonopin, and Luvox

and stated that they stabilized and controlled her moods and helped

her sleep.  She attended counseling with her husband for two weeks

following her hospital admission and was seeing a psychiatrist, Dr.

Pauig, once a month for medication checks.

Santowasso reported a recent episode of mania that had now

stabilized. She stated that she wanted her closets arranged in a

certain order, her books in a certain order, checked her stove to

make sure it was off, checked her doors, was afraid to be alone

since the rape by her father-in-law and was worried about her

13

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

safety because he still lived in the area part of the year. She had poor sleep which she related to menopause, and had low energy.

Santowasso reported that she retired from the phone company in 1993, the year of her mastectomy, and that her husband was disabled and also retired from the phone company. She described her daily activities as getting up between 8 and 9 a.m., making breakfast for her husband, doing the laundry in the mornings, reading, washing dishes, working in the garden for ½ to one hour in the morning, then resting, pacing her housework because of fatigue, shopping with her husband because she could not lift a grocery bag, doing all the inside housework, talking on the phone, no computer work or typing because of the weakness in her right arm and lack of concentration, visiting neighbors and relatives regularly, attending cancer survivors' support group once a month, and recently joining a church women's group.

Upon Mental Status Examination, Dr. Fremouw noted that Santowasso was friendly and cooperative, described her mood as "a little tired," could recall five digits forward and backward, could perform serial three's correctly, and was coherent and logical with no evidence of delusions, paranoia, hallucinations, suicidal or homicidal thoughts, panics or phobia. Testing indicated a verbal IQ

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

of 100, a performance scale IQ of 93 and a full scale IQ of 97, reading and arithmetic at high school level, and spelling at the seventh grade level.

Dr. Fremouw found Santowasso's concentration and pace slightly below average. His diagnosis was bipolar disorder, most recent episode manic, and obsessive compulsive disorder with insight;

11. A May 9, 1998, Psychiatric Review Technique form ("PRT") from James Capage, Ph.D., a State agency psychologist, indicating slight restrictions of daily living, slight difficulties in maintaining social functioning, seldom experiencing deficiencies of concentration, persistence or pace, and one or two episodes of decompensation.

Dr. Capage also completed a Mental Residual Functional Capacity assessment ("MRFC") on May 9, 1998 and indicated 1) moderate limitation in the ability to maintain attention and concentration for extended periods, 2) moderate limitation in ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, 3) moderate limitation in ability to perform at a consistent pace without an unreasonable number of rest periods, and 4) no other limitations.

Dr. Capage noted:

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

> Severe impairments are present which do not
> meet nor equal the Listings and do not impose
> marked functional limitations. It seems that
> she could perform a variety of tasks in a low-
> pressure setting;

12.  A June 10, 1998, letter from Dr. Pauig, indicating he had
seen Santowasso on January 13, 1998 and May 7, 1998 for follow-up
care after her hospital admission. Pauig indicated Santowasso had
a diagnosis of bipolar affective disorder and obsessive compulsive
disorder with a history of severe mood swings, sometimes very
anxious and sometimes very depressed, and was obsessed with
thoughts of recurrence of cancer. On her second visit, in May, she
was still extremely anxious and fearful of disease.  He concluded:
"In view of her physical and psychiatric impairment, Ms. Santowasso
is unable to perform any form of gainful employment on a sustained
basis";

13.  A June 25, 1998, PRT from Joseph Kuzniar, Ph.D., a state
agency reviewing psychologist, indicating a slight degree of
restriction of daily activities and difficulties in maintaining
social functioning, moderate restriction in deficiencies in
concentration persistence or pace resulting in failure to complete
tasks in a timely manner and one or two episodes of deterioration
or decompensation in work or work-like settings which cause her to

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

withdraw from the situation. Dr. Kuzniar noted that, prior to her hospitalization, Santowasso had not taken any of her current medications, that, since starting them, her condition had stabilized, and determined that with treatment Santowasso would remain stabilized;

14. A July 16, 1998, office note from Fairmont Physicians, Inc. indicating Dr. Pauig had "weaned [Santowasso] off Klonopin";

15. An August 11, 1998, Mental Impairment Questionnaire from Dr. Pauig indicating Santowasso had poor to no ability 1) to maintain attention for two hour segments, 2) to maintain regular attendance and be punctual within customary, usually strict tolerance, 3) to work in coordination with or proximity to others without being distracted, 4) to complete a normal workday and workweek without interruptions from psychologically based symptoms, 5) to perform at a consistent pace without an unreasonable number and length of rest periods, 6) to deal with normal work stress, 7) to carry out detailed instructions, 8) to set realistic goals or make plans independently of others, 9) to deal with stress of semiskilled and skilled work, 10) to interact appropriately with the general public, 11) to maintain socially appropriate behavior, 12) to travel in unfamiliar places, and 13) to use public

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

transportation. Dr. Pauig also indicated a moderate limitation in restriction of activities of daily living, marked difficulty in maintaining social functioning, experienced frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere), and had continual episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms.

Dr. Pauig indicated Santowasso's current GAF was 70[7,8]. His diagnosis was bipolar disorder. Dr. Pauig indicated Santowasso continued to report recurrent periods of manic and depressive symptoms;

---

[7]A GAF of 61 to 70 indicates **Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household)**, but generally functioning pretty well, has some meaningful interpersonal relationships.** Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

[8]On March 25, 1999, Dr. Pauig wrote to Santowasso's counsel regarding a phone conference the two had had that day, and stating that the 70 GAF in his report was an error and her rating should be 50.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

16. A May 26, 1999, psychological report from Charles Hewitt, Ph.D., on referral by her attorney. Dr. Hewitt observed that Santowasso was cooperative, reasonably responsive, spoke logically and coherently, had no bizarre behaviors, was normally curious, maintained a serious demeanor, and worked at a slow to moderate but steady pace. Dr. Hewitt noted that Santowasso could care for most of her everyday needs and had satisfactory judgment. He diagnosed Major Depression, History of Bipolar Disorder, OCD, Agoraphobia, and residuals of PTSD, and a GAF between 40-50 "because there clearly is some impairment in reality testing."

Dr. Hewitt commented that "it seems that a psychiatrist allegedly graded her too high on one of the DSM-IV adjustment scales, complicating the picture of her psychological adjustment after her in-patient hospitalization in December of 1997. There may have been an inadequate foundation laid for an opinion regarding disability after December 1997."

Dr. Hewitt noted:

> Because of her multiple psychological conditions and the severity thereof she is unable to manage any substantial work in any reasonably recognized segment of the job market. It is unimaginable that from a psychological standpoint she could manage work such as an assembler, packer or janitor. She used to do many tasks at home that are

19

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

> parallel to these kinds of jobs but which she
> hasn't been doing substantially since 1993.
> For example, she can't sit and pack fruits and
> vegetables for canning or freezing as she used
> to do vigorously and well. She can't tolerate
> being around people except her husband and one
> or two close and trusted associates. She stays
> at home most of the time though she has tried
> a foray or two in rehabilitative efforts
> (e.g., a cancer support group twice, a church
> group once). This examiner has done vocational
> evaluations since 1980 and respectfully begs
> to differ with the vocational expert who felt
> that she could be a janitor, packer or
> assembler.

> Within a reasonable degree of psychological
> certainty, Mrs. Santowasso's multiple and
> severe medical conditions are permanent,
> adversely affect, and disqualify her from
> substantial employment in a meaningful segment
> of the job market. She has been disabled since
> 1993 and will continue to be disabled
> throughout most, if not all, of her adult
> life.

Dr. Hewitt recommended continued consultation to monitor for
deterioration and medication for symptomatic relief;

17. A June 5, 1999, PRT from Dr. Hewitt indicating Santowasso
met listing 12.04 with 12.06 due to a marked restriction of
activities of daily living, marked difficulties in maintaining
social functioning, marked deficiencies in concentration,
persistence or pace, and one or two "specific, rather dramatic
instances of decompensation" in a work or work-like setting, or

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

three or more general, frequent episodes of decompensation – *i.e.*, problems leaving the area of her neighborhood;

18. On July 27, 2000, Santowasso had an appointment to talk with Dr. Mary Myers for counseling regarding her psychological impairments. Santowasso arrived one hour late for her 9:45 a.m. appointment and was asked to wait due to two emergencies. Mr. Santowasso became "pressured" and "agitated" and the staff apologized for the wait, offered to see Santowasso next or to reschedule. Mr. and Mrs. Santowasso left at 12:00 and there is no evidence in the record that they ever returned;

19. An October 25, 2000, evaluation from Dr. Fremouw at which Santowasso indicated the hospitalization in 1997 was for depression with significant weight loss and sleep disturbance and not a manic phase. On mental status examination, Dr. Fremouw stated:

> The applicant had a clean, plain appearance and was wearing no makeup or jewelry. ATTITUDE: She was cooperative but down. SOCIAL: Social skills were down and never smiled with sporadic eye contact. SPEECH: Her speech was slow. ORIENTATION: She was oriented times four. MOOD: She described her mood as 'a little tired.' She rated her anxiety level as an 8 on a 9-10 scale, but did not appear anxious overtly. AFFECT: Affect was restricted. THOUGHT PROCESS: Thought processes were logical and coherent. THOUGHT CONTENT: Shows no delusions, persecutions or grandiosity. She worries and is obsessed about

> her safety, about details and about possible
> threats to her house from the stove or coffee
> pot. She does frequent checking to insure that
> these appliances are not on. PERCEPTUAL: No
> hallucinations or illusions. INSIGHT: She is
> aware that the medication is helping control
> these obsessive thoughts and compulsions. Her
> other medication also helps lessen her mood
> swings. JUDGMENT: Within normal limits.
> SUICIDAL/HOMICIDAL IDEATION: None now or in
> the past. IMMEDIATE MEMORY: Within normal
> limits. RECENT MEMORY: Within normal limits.
> REMOTE HISTORY: Within normal limits.
> CONCENTRATION: She recalled seven digits
> forward and four digits backwards.
> PSYCHOMOTOR: No agitation, pacing or
> fidgeting.

Dr. Fremouw diagnosed Bipolar II disorder, predominantly depressed type, and OCD, mild with insight. He indicated her daily activities were getting up around 9:00 a.m, taking her medications, calling a relative on the phone, doing light housework, helping her husband, reading, doing laundry and cooking with her husband's help, shopping with her husband, and going to bed around 10:00 p.m. He also reported that Santowasso left the house with her husband, did not drive very far and attended a cancer support group once a month. Dr. Fremouw found her social functioning during the evaluation "was adequate, but somewhat somber" and her concentration and immediate and recent memory were within normal limits. Dr. Fremouw indicated her prognosis was "guarded;"

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

20. A November 2, 2000, report from Samuel Goots, Ph.D., a state agency reviewing psychologist, indicating Bipolar Disorder and OCD that were not severe. Dr. Goots indicated mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation of extended duration;

21. A June 6, 2001, notation on the November 2, 2000 PRT from Samuel Goots, Ph.D, indicating Dr. Capage, a state agency reviewing physician, reviewed all the evidence in the file and agreed with the assessment of November 2, 2000 that the mental impairments were not severe;

22. A March 18, 2002, evaluation from Raveen Mehendru, M.D. indicating a diagnosis of "bipolar affective disorder, currently depressed, obsessive compulsive disorder." Dr. Mehendru noted Santowasso was "remarkably evasive regarding the behavior cognitive plan for cleaning up the stash of magazines." His rationale and plan of psychiatric care indicated:

> The psychiatric plan of treatment is based upon the psychiatric necessity of ongoing symptom surveillance, since patient has high potential for relapse of symptoms; engaging the patient to improve medication compliance and adherence to a behavioral plan; monitoring

23

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

> response to medication and behavioral
> interventions; and evaluation for medication
> related side-effect.
>
> This is required to ameliorate current
> psychiatric state, attain stabilization of
> symptoms, attempt to prevent relapse of
> disabling symptoms and improve the level of
> psycho-social functioning;

23. A June 14, 2002 psychological consultative evaluation
from Martin Levin, M.A., at the request of the ALJ, indicating
"classic panic disorder symptoms of racing heart, sweaty palms,
difficulty breathing, feeling as through she was having a heart
attack."

Upon Mental Status Examination, Mr. Levin found Santowasso was
appropriately dressed and groomed, was pleasant and cooperative,
made good eye contact, behaved in a socially appropriate manner,
had normal speech, was fully oriented, had a somewhat anxious mood
that was appropriate to the circumstances, had a mildly restricted
affect and had average memory and concentration.

Santowasso described her daily activities as generally arising
by 9:00 a.m., taking her medications, waiting an hour before eating
due to the medications, spending a good deal of her time making
phone calls and visiting with her neighbor and an aunt, maybe
watching television, doing some cooking and cleaning, helping her

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

husband with the housework and working in the garden when she could.

Mr. Levin diagnosed PTSD and panic disorder without agoraphobia. He noted that Santowasso had average concentration, persistence, pace, and memory; that her impairments did not affect her ability to understand, remember, and carry out instructions; that she had a moderate limitation on interacting appropriately with the public, supervisors, and coworkers and a moderate limitation of her ability to respond appropriately to work pressures in a usual work setting and changes in a routine work setting; and that she had no other limitation. The basis for Mr. Levin's limitations was panic attacks exacerbated by stress. Mr. Levin noted that her prognosis was fair;

24. An August 14, 2002, letter from Dr. Pauig indicating a diagnosis of bipolar affective disorder/depressed and OCD. Her medications were Luvox and Depakote. Dr. Pauig also indicated:

> I feel without proper treatment and medication management of her neuroleptics the patient would severely decompensate. It is my opinion that the patient would not benefit from gainful employment;

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

25.  An August 28, 2002, Mental Impairment Questionnaire from
Dr. Pauig indicating Santowasso would be "extremely"[9] limited in
her ability to travel in unfamiliar places or use public
transportation; set realistic goals or make plans independently of
others; maintain attention for extended periods; work in
coordination or proximity to others without being unduly distracted
by them; make simple work-related decisions; complete a normal
workday and workweek without interruptions from psychologically
based symptoms and perform at a consistent pace without an
unreasonable number and length of rest periods; interact
appropriately with the general public; ask simple questions or
request assistance; accept instructions and respond appropriately
to criticism from supervisors; get along with coworkers or peers
without unduly distracting them or exhibiting behavioral extremes;
and maintain socially appropriate behavior and adhere to basic
standards of neatness and cleanliness. He found her markedly
limited in her ability to understand, remember, and carry out very
short and simple instructions, sustain an ordinary routine with
supervision, respond appropriately to changes in a routine work

---

[9]An extreme limitation is defined on the form as having *no*
useful ability to function in this particular area.

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

setting and be aware of normal hazards and take appropriate precautions and slightly limited in her ability to remember work-like procedures.

Dr. Pauig stated that Santowasso's condition had lasted or was expected to last twelve months, due to poor response to treatment and "lack of motivation" and was still disabled "because of the severity of the Bipolar Disorder and other physical impairments"; and

26. A September 5, 2002, letter from Dr. Pauig to Santowasso's counsel, referring him to his August 14, 2002 letter and indicating:

> Please be informed as the result of Mrs. Santowasso's diagnosis of Bipolar disorder and Obsessive Compulsive Disorder and current medical conditions, she is markedly limited to perform her usual daily activities.
>
> Also, please be informed her GAF has diminished to 40%.

V. <u>DISCUSSION</u>

A.   <u>Consulting Psychologist Limitations</u>

Santowasso objects to the Magistrate Judge's report and recommendation, contending that the ALJ failed to consider the

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

limitations noted by a consulting psychologist prior to making his residual functional capacity determination ("RFC").

As noted, on January 14, 2002, Levin completed the evaluation and diagnosed PTSD and panic disorder without agoraphobia. Levin noted that he reviewed the evidence of record including the June 5, 1999 psychological report from Charles W. Hewitt, Ph.D. that noted Santowasso had a full scale IQ of 98, a verbal IQ of 91 and a performance IQ of 107 and diagnosed major depression, Bipolar disorder-manic, obsessive compulsive disorder, agoraphobia and PTSD. He also reviewed the December 1997 report from Dr. Fremouw that noted a full scale IQ of 97, a verbal IQ of 100 and a performance IQ of 93 and a diagnosis of PTSD.

Following his review and evaluation, Levin indicated Santowasso had average concentration, persistence and pace, average memory, no limitation in her ability to understand, remember, and carry out instructions, moderate limitation on interacting appropriately with the public, supervisors and coworkers, moderate limitation in her ability to respond appropriately to work pressures in a usual work setting and changes in a routine work setting, and no other limitations. Mr. Levin explained that the panic attacks were exacerbated by stress.

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

Here, in his November 22, 2002 decision, the ALJ noted:

> On June 14, 2002, the claimant underwent a
> mental status examination by consultative
> psychologist, Martin Levin, M.A. Psychologist
> Levin reported an essentially normal mental
> status examination, observing only that the
> claimant appeared to be somewhat anxious but
> appropriate for the circumstances with a
> mildly restricted affect, and diagnosed post
> traumatic stress disorder and a panic disorder
> without agoraphobia. As a result, psychologist
> Levin found that the claimant would have
> moderate difficulties responding to work
> pressures.

As noted earlier, the Appeals Council remanded Santowasso's first claim because: 1) the tape was missing from the hearing; 2) the Appeals Council was not persuaded that the evidence supported the ALJ's finding that Santowasso's mental condition met Listing 12.04 or any other listing on or before December 31, 1997; 3) there was a question regarding Dr. Pauig's assessment of Santowasso's GAF reflected in a letter indicating he had made an error; and 4) Santowasso had filed a new application that would be made redundant by the remand of the prior application. The Appeals Council directed the Commissioner to consolidate the cases and directed the ALJ to hold a *de novo* hearing and obtain evidence from a medical expert to clarify the nature and severity of Santowasso's

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

impairments if he "*believe[d]* a medical expert *should be utilized* at the hearing, *if available*" (emphasis added).

The Appeals Council's Order in the first claim was entered August 22, 2002; however, on May 16, 2002, the ALJ in the second claim had held a *de novo* hearing, had referred Santowasso for a psychological consultative examination and had received and reviewed the report from the psychological consultative evaluation. The ALJ in the second claim also had Dr. Pauig's letter in which he indicated his error regarding Santowasso's GAF. Therefore, even though the Order entered after the second hearing and consultative examination was filed before the Appeals Council's Order, the Magistrate Judge determined that the second ALJ's *de novo* hearing, as well as the psychological consultative examination he had obtained, satisfied the Appeals Council's Order.

Therefore, the Magistrate Judge determined that the ALJ had properly considered and weighed the psychological consultative report from Levin prior to making his RFC decision. The Court agrees.

B.

Santowasso objects to the Magistrate Judge's report and recommendation and argues that the ALJ failed to explain the weight

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

assigned to the medical evidence regarding her limitations. In the

January 22, 2002 opinion, the ALJ determined:

> In evaluating this objective medical evidence,
> as well as the other evidence of record, the
> Administrative Law Judge finds that once the
> claimant's mental impairments were diagnosed
> and treated with therapy and medication, there
> was significant medical improvement in the
> severity of the claimant's mental impairments
> to the point where, as of January 1, 1998, her
> mental impairments no longer met or equaled
> Listing 12.04 or Listing 12.06. While the
> claimant's mental impairments still satisfied
> the 'A' criteria of Listings 12.04 and 12.06,
> the evidence failed to establish either the
> 'B' criteria or the 'C' criteria, thereunder.
> In so finding, the Administrative Law Judge
> has given significant weight to the
> psychiatric review technique forms ('PRTF')
> and Mental Residual Functional Capacity
> assessment ('MRFC') prepared by the reviewing
> psychologists for the state agency on May 9,
> 1998 (Exhibits 14F; 13F), on June 26, 1998
> (Exhibit 17F), on November 2, 2000, and on
> June 6, 2001 (Exhibit B6F). These assessments
> are well reasoned, supported by the medical
> evidence of record, and made by specialists
> who have an understanding of the disability
> programs and their evidentiary requirements.
> The Administrative Law Judge has also
> considered the assessments and opinions of
> Drs. Pauig and Mehendru, which if given
> controlling weight would preclude all work
> (Exhibits 15F; 18F; B11F; B16F). The
> Administrative Law Judge, as was found in the
> prior decision, gives little weight to these
> conclusory assessments since they are not
> supported by actual treatment notes that
> describe abnormal clinical signs or diagnostic
> findings, which would support these very

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

severe limitations. Additionally, they are
inconsistent with Dr. Fremouw's and
psychologist Levin's findings, the PFRTs and
the MRFC by the reviewing psychologists for
the state agency, and the claimant's own
statements and demeanor at the hearings. For
the same reasons, Dr. Hewitt's PRFT dated
June 5, 1999, finding that the claimant
continued to meet Listing 12.04, is given
little weight (Exhibit B12F). Further Drs.
Pauig's Mehendru's and Hewitt's assessments
were based primarily on the claimant's
subjective complaints that are not entirely
credible. Finally, psychologist Levin's
assessment (Exhibit B14F, pp 4-5) is given
significant weight as it is consistent with
and supported by the PRTFs and the MRFC by the
reviewing psychologists, Dr. Fremouw's
reports, and Dr. Mehendru's psychiatric
evaluation on March 18, 2002, contrary to
counsel's argument (Exhibit 13E).

Clearly, the ALJ considered all the evidence of record including

the opinions of the two psychologists, Dr. Pauig and Dr. Mehendru.

On June 10, 1998, psychiatrist Pauig noted:

Please be informed I have seen the above-named
patient [Karen S. Santowasso] on 01/13/98 and
05/07/98 for outpatient follow-up care. Ms.
Santowasso carries a diagnosis of Bipolar
Affective Disorder and Obsessive Compulsive
Disorder. Patient has a history of multiple
medical problems. She had a mastectomy for
cancer of the breast, a hysterectomy,
radiation treatments of her thyroid because of
Grave's Disease. There was also a question in
the past of metastatic lesion from the cancer.

Ms. Santowasso has a history of severe mood
swings. There are times she gets extremely

32

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

anxious and times she gets very depressed. On her visits to my office she has been obsessed with cancer and continues to express fear of recurrence of diseases, especially cancer. She has been on Depakote 750 mg daily and she [is] on Luvox 250 mg daily. She also takes Klonopin 1 mg at bedtime, Synthroid.075 daily, Zocor 10 mg every other day, and Zantac 150 mg twice daily.

On her last visit on 05/07/98, she still was extremely anxious and continued to express fear of her disease. In view of her physical and psychiatric impairment, Ms. Santowasso is unable to perform any form of gainful employment on a sustained basis.

20 C.F.R. Pt. 404, Subpt P, App1, 12.04 Affective Disorders provides:

Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.    Medically documented persistence, either continuous or intermittent, of one of the following:

1.    Depressive syndrome characterized by at least four of the following:

a.    Anhedonia or pervasive loss of interest in almost all activities; or

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

b.   Appetite disturbance with change in weight; or

c.   Sleep disturbance; or

d.   Psychomotor agitation or retardation; or

e.   Decreased energy; or

f.   Feelings of guilt or worthlessness; or

g.   Difficulty concentrating or thinking; or

h.   Thoughts of suicide; or

i.   Hallucinations, delusions or paranoid thinking; or

2.   Manic syndrome characterized by at least three of the following:

a.   Hyperactivity; or
b.   Pressure of speech; or
c.   Flight of ideas; or
d.   Inflated self esteem; or
e.   Decreased need for sleep; or
f.    Easy distractability; or
g.   Involvement in activities that have a high probability of painful consequences which are not recognized; or
h.   Hallucinations, delusions or paranoid thinking; or

3.   Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulty in maintaining concentration, persistence or pace; or

4. Repeated episodes of decompensation, each of extended duration . . . .

20 C.F.R. Pt. 404, Subpt P, App1, Listing 12.06 states:

Anxiety Disorders: In these disorders, anxiety is either the predominant disturbance or is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied:

A. Medically documented findings of at least one of the following:

1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

a. motor tension; or
b. Autonomic hyperactivity; or
c. Apprehensive expectation; or
d. Vigilance and scanning;

OR

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in a least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence or pace; or

36

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

4. Repeated episodes of decompensation each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's own home.

Two months after the June 10, 1998 opinion and, after only one other office visit, Dr. Pauig completed a Mental Impairment Questionnaire and determined that Santowasso had a fair or poor to no ability to engage in any mental work-related activities. At this time, Dr. Pauig reported Santowasso's GAF as 70. However, eight months later, he advised that the GAF was incorrect and should have been 50. He did not change the opinion that her highest GAF over the past year was 70. Importantly, even had Dr. Pauig incorrectly reported the GAF as 70 when the GAF really was 50, the record still does not contain evidence to support the severe limitations contained in his opinion.

On August 14, 2002, Dr. Pauig wrote a letter to Santowasso's counsel stating that he had not been her psychiatrist since May 2001, but she had "chosen to return to [him] for continuing treatment". He noted a diagnosis of Bipolar Affective Disorder/Depressed and OCD and listed her medications. He then wrote:

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

> I feel without proper treatment and medication management of her neuroleptics the patient would severely decompensate. It is of my opinion that the patient would not benefit from gainful employment.

There is no indication in the record that Santowasso did not receive proper treatment and management of her impairments at any time. Furthermore, Dr. Pauig's statement that she "would not benefit from employment" is not the same as stating she was not capable of working.

On September 5, 2002, Dr. Pauig again wrote to counsel stating that "as the result of [Plaintiff's] diagnosis of Bipolar Disorder and Obsessive Compulsive Disorder and current medical conditions, she is markedly limited to perform her usual daily activities and advised that her GAF "ha[d] diminished to 40%." He also completed a Mental Impairment Questionnaire indicating that Santowasso would be extremely or markedly limited in every functional area except for her ability to remember work-like procedures.

Dr. Pauig opined Santowasso's condition had lasted or was expected to last twelve months, due to poor response to treatment and lack of motivation. He indicated she was still disabled "because of the severity of the Bipolar Disorder and other physical impairments."

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

The record establishes that Santowasso returned to the care of Dr. Pauig on July 18, 2002 and that he saw her on only two occasions prior to rendering his opinion on September 5, 2002. His report refers to her physical complaints and medications and notes that her granddaughter was staying with her for four weeks, and that her Luvox was decreased after she developed a reaction to it. At the second office visit, the next month, Dr. Pauig again discussed only her physical problems, her medications, and the fact that her granddaughter had stayed with her for one month and then returned home to South Carolina. Thus, the record simply does not contain any support for the severity of the limitations listed in Dr. Pauig's opinion.

In between the two opinions from Dr. Pauig, Santowasso saw Dr. Mehendru. His March 18, 2002 diagnosis was Bipolar Disorder and OCD. Santowasso complained that her night sleep was "some what [sic] impaired, with significant problems with initial insomnia," and that she had an "obsessive preoccupation with collecting magazines." He indicated her mood was "somewhat anxious and less depressed than in the past", and she had no side effects from the medications. Dr. Mehendru noted she had a high potential for relapse of symptoms and discussed the importance of medication

management and follow-up in relapse prevention.  He continued her medications and scheduled a follow up appointment in ten weeks.

Before that second appointment, Dr. Mehendru completed a mental impairment questionnaire opining that Santowasso's GAF was 45, and he had no way of knowing the highest it had been in the past year.  He then opined that her ability in every functional area was either fair or poor-to-none.

Significantly, there is no indication in the record that Dr. Mehendru did any testing. The record does not contain any clinical or diagnostic test results and the notes from the one office visit do not support the severe limitations listed in his opinion.

Martin Levin evaluated Santowasso on June 14, 2002, less than a month after Dr. Mehendru completed his questionnaire. Levin noted that Santowasso described "classic panic disorder symptoms of racing heart, sweaty palms, difficulty breathing, feeling as through she was having a heart attack" diagnosed PTSD and panic disorder without agoraphobia.

Levin indicated that Santowasso had average concentration, persistence and pace, average memory, no limitation in her ability to understand, remember, and carry out instructions, moderate limitation on interacting appropriately with the public,

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

supervisors and coworkers, moderate limitation in her ability to
respond appropriately to work pressures in a usual work setting and
changes in a routine work setting, and no other limitations.  Mr.
Levin explained that the panic attacks were exacerbated by stress.

In <u>Craig v. Chater</u>, 76 F.3d 585, 590(4th Cir. 1996), the
Fourth Circuit held:

> Circuit precedent does not require that a
> treating physician's testimony 'be given
> controlling weight.' <u>Hunter v. Sullivan</u>, 993
> F.2d 31, 35 (4th Cir. 1992).  In fact, 20
> C.F.R. § 404.1527(c)(2) and 416.927(d)(2)
> (emphasis added) both provide,
>
>> [i]f we find that a treating
>> source's opinion on the issue(s) of
>> the nature and severity of [the]
>> impairment(s) is well supported by
>> medically acceptable clinical and
>> laboratory diagnostic techniques and
>> is not inconsistent with the other
>> substantial evidence in [the] case
>> record, we will give it controlling
>> weight.
>
>> [4,5] By negative implication, if a
>> physician's opinion is not supported by
>> clinical evidence or if it is inconsistent
>> with other substantial evidence, it should be
>> accorded significantly less weight.

SSR 96-5p provides:

> To clarify Social Security Administration (SSA)
> policy on how we consider medical source opinions
> on issues reserved to the Commissioner, including
> whether an individual's impairment(s) meets or is

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

equivalent in severity to the requirements of any impairment(s) in the Listing of Impairments in appendix 1, subpart P of 20 CFR part 404 (the listings); what an individual's residual functional capacity (RFC) is; whether an individual's RFC prevents him or her from doing past relevant work; how the vocational factors of age, education, and work experience apply; and whether an individual is "disabled" under the Social Security Act (the Act). In particular, to emphasize:

1.  The difference between issues reserved to the Commissioner and medical opinions.

2.  That treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance.

3.  That opinions from any medical source about issues reserved to the Commissioner must never be ignored, and that the notice of the determination or decision must explain the consideration given to the treating source's opinion(s).

4.  The difference between the opinion called a "medical source statement" and the administrative finding called a "residual functional capacity assessment."

SSR 96-5p also states:

Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is 'disabled' or 'unable to work,' or make similar statements of opinions. In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work. Because these are

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

> administrative findings that may determine
> whether an individual is disabled, they are
> reserved to the Commissioner.   Such opinions
> on these issues must not be disregarded.
> However, even when offered by a treating
> source, <u>they can never be entitled to
> controlling weight or given special
> significance</u>.  (Emphasis added.)

After careful review of all of the evidence of record, the
Magistrate Judge determined that the ALJ did not err in the weight
assigned to the opinions of Dr. Pauig and Dr. Mehendru because
their opinions were not supported by diagnostic testing and were
inconsistent with the other medical evidence of record and, in
fact, pursuant to SSR 96-5p, would never be entitled to controlling
weight or special significance.

As noted on page 31, the ALJ determined that significant
weight should be assigned to the PRTs and MRFCs of the State agency
psychologists. The ALJ also found:

> The first area of the 'B' criteria is
> 'activities of daily living.' The state
> agency's psychologists' PRTFs found only a
> mild restriction in this area.   In fact Dr.
> Mehendru also found slight restrictions
> (Exhibit B11F, p 7), although Dr. Pauig found
> moderate restrictions (Exhibits 18F, p. 7;
> B16F, p12). Dr. Fremouw reported that the
> claimant did light housework, laundry, and
> cooking with help form her husband, and that
> she likes to garden. The claimant also
> reported good activities of daily living which
> were restricted by her physical impairments.

43

## ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

Of particular significance is the claimant's initial disability report dated January 22, 1998, where she reported cooking three meals a day, doing laundry three to four times per day, baking once or twice a week, grocery shopping with her husband, and canning and freezing vegetables from her garden. (Exhibit 4E, p4.) Subsequent reports showed little change, and the claimant and the other witnesses testified that she continues to attend to her personal needs and grooming, along with her household chores, cooking, laundry, and gardening, although she needs some help because of her right arm weakness and pain. Based upon the evidence of record, the Administrative Law Judge finds that the claimant has only 'mild' restrictions in activities of daily living.

The second area of the 'B' criteria is 'social functioning.' The state agency's psychologists' PRTFs found only mild difficulties is [sic] this area. Both Drs. Pauig and Mehendru found marked limitations, as did Dr. Hewitt. Dr. Fremouw reported that the claimant attends a cancer support group, talks to friends and relatives on the phone, and visits neighbors and relatives regularly. Dr. Hewitt also reported that the claimant visits with and talks to family members, and visits an elderly lady who lives nearby every Sunday where they read the newspaper. The claimant also reported visiting neighbor, friends and relatives in her initial disability report dated January 22, 1998. (Exhibit 4E, p 4). In February and May 1998 the claimant reported numerous activities, interests, and social contacts. (Exhibits 7E; 11E). The claimant reported in March 1999 that she had no change in her condition during 1998, stating that it was stable and should be as along [sic] as he [sic] continues to take

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

her medicine. (Exhibit 14E, p 1). In her second disability report the claimant stated that she was afraid of driving alone, and had a fear of strangers and crowds. However, the claimant reported on September 9, 2000, and on April 19, 2000, that she continued to visit friends and relatives, and goes shopping and to medical appointments, although her husband accompanies, and that she felt 'uneasy' around most men and did not trust people that she did not know. (Exhibits B5E; B3E). On January 10, 2001, she reported that the only restriction her psychiatrists placed on her was to 'keep stress to a minimum.' (Exhibit B4E). The claimant and the other witnesses also testified to the claimant's continued social interaction with friends and relatives, which included a trip to South Carolina in February 2002, to visit her daughter and grandson. Her sister visits her weekly and she sees her friend who testified once or twice per month. She also attends church and drives occasionally, although her husband claimed that she could not be left alone. He also testified that she attends a cancer support group. Although the Administrative Law Judge finds that the testimony regarding the claimant's limitations not to be entirely credible, her mental impairments do restrict her social activities, but not to the extent alleged or found by her psychiatrists, including GAF assessments in the 40s that are far too severe, especially considering that their primary advice to the claimant was to avoid stress and take her medication. Additionally, the claimant had no problems relating at the hearing, and showed no outward signs of distress, a like observation was noted in the prior decision. Giving the claimant the benefit of the doubt, and giving some weight to her psychiatrists' assessments and to dr. Hewitt's PRTF, <u>the Administrative</u>

45

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Law Judge finds that the claimant would have
'moderate' difficulties in maintaining social
functioning.

The third area of the 'B' criteria is
'concentration, persistence or pace.' The
state agency's psychologists' PRTFs found only
mild difficulties is [sic] this area, except
for the June 26, 1998 PRFT that assessed
moderate difficulties, but noted that since
her hospitalization her condition has
stabilized on her current medication, and will
remain stable with treatment. (Exhibit 17F).
Both Drs. Pauig and Mehendru found marked
limitations, as did Dr. Hewitt. Dr. Fremouw
found the claimant's concentration to be
slightly below average on May 9, 1998, but
then improved to within normal limits on
October 25, 2000, indicating a very stable
condition (Exhibit 12F; B5F), corroborating
the June 26, 1998 PRTF. Dr. Hewitt also found
the claimant to function intellectually within
the average range with memory generally
intact, who worked at a slow to moderate, but
steady pace, although he stated that her
depressed mood may adversely affect her
memory. (Exhibit B1F) The claimant also
reported in her initial disability report that
she liked to read and write letters, but
needed frequent rest periods. (Exhibit 4E). In
February and May 1998, the claimant reported
some problems with concentration and memory,
but again due to fatigue. (Exhibits 7E; 11E).
Statements in September 2000, and April 2001,
reported forgetfulness unless she is in a
'quiet place' and fatigue (Exhibit B3E; B5E).
As noted earlier, the claimant reported that
her condition was stable and would so remain
provided she continue her mediation and kept
stress to a minimum. (Exhibit 14E; B4E0. She
testified that she likes to read short
stories, but that her mediation causes her to

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

be fatigued. This latter statement is inconsistent with her psychiatrist's treatment note on March 18, 2002, that her medication caused no side effects. (Exhibit B13F, p 4). Giving the claimant the benefit of the doubt, and giving some weight to her psychiatrists' assessments and to Dr. Hewitt's PRTF, the Administrative Law Judge finds that the claimant would have 'moderate' difficulties in maintaining concentration, persistence or pace.

The last area of functioning evaluated under the 'B' criteria is 'episodes of decompensation.' The objective medical evidence of record supports a finding of 'one or two' episodes of decompensation, namely the hospitalization in December 1997. Since January 1, 1998, the evidence, as discussed above, shows that the claimant's condition has stabilized with her treatment and medication. Therefore, the Administrative Law Judge finds that the claimant has had one or two episodes of decompensation.

Furthermore, the objective medical evidence of record does not establish that the claimant's mental impairments have caused such marginal adjustment that even minimal increase in mental demands or change in the environment would cause the claimant to decompensate or that the claimant has been unable to function outside of a highly supportive living arrangement, as required under the 'C' criteria of the Listing 12.04. Additionally, the evidence does not establish the 'C' criteria of Listing 12.06, because her OCD has not resulted in a complete inability to function outside the area of her home.

(Emphasis added).

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

be fatigued. This latter statement is
inconsistent with her psychiatrist's treatment
note on March 18, 2002, that her medication
caused no side effects. (Exhibit B13F, p 4).
Giving the claimant the benefit of the doubt,
and giving some weight to her psychiatrists'
assessments and to Dr. Hewitt's PRTF, the
Administrative Law Judge finds that the
claimant would have 'moderate' difficulties in
maintaining concentration, persistence or
pace.

The last area of functioning evaluated under
the 'B' criteria is 'episodes of
decompensation.' The objective medical
evidence of record supports a finding of 'one
or two' episodes of decompensation, namely
the hospitalization in December 1997. Since
January 1, 1998, the evidence, as discussed
above, shows that the claimant's condition has
stabilized with her treatment and medication.
Therefore, the Administrative Law Judge finds
that the claimant has had one or two episodes
of decompensation.

Furthermore, the objective medical evidence of
record does not establish that the claimant's
mental impairments have caused such marginal
adjustment that even minimal increase in
mental demands or change in the environment
would cause the claimant to decompensate or
that the claimant has been unable to function
outside of a highly supportive living
arrangement, as required under the 'C'
criteria of the Listing 12.04. Additionally,
the evidence does not establish the 'C'
criteria of Listing 12.06, because her OCD has
not resulted in a complete inability to
function outside the area of her home.

(Emphasis added).

47

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

The ALJ's treatment of the State agency physician opinion is consistent with 20 CFR § 404.1527(i), which provides:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists as opinion evidence, except for the ultimate determination about whether you are disabled.

In May 1998, Dr. Capage, a State agency psychologist, opined that Santowasso was moderately limited in her ability to maintain attention and concentration for extended periods, in her ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. He also indicated that Santowasso would have a slight restriction of activities of daily living, slight difficulties in maintaining social functioning, would seldom have deficiencies of concentration, persistence or pace and had had one or two episodes of deterioration in a work or work-like setting.

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Dr. Capage cited the April 1998 report from Dr. Fremouw which noted that Santowasso functioned fairly well, and noted a diagnosis of bipolar disorder, most recent episode manic, and OCD with insight and found severe impairments that did not meet or equal the listings because they did not impose marked functional limitations. Dr. Capage determined that Santowasso could perform a variety of tasks in a low-pressure setting.

In June 1998, Dr. Kuzniar, another state agency psychologist, diagnosed bipolar disorder and OCD and noted both were severe impairments. Significantly, Dr. Kuzniar noted that, prior to her hospitalization, Santowasso had not been on her medication, which had stabilized her condition, and also noted that, with continued treatment, her condition would remain stable. Dr. Kuzniar completed a PRT that indicated Santowasso would "often" have deficiencies in concentration, persistence or pace.

Finally, in November 2000, over two years after the other State psychologist PRTs, Dr. Goots completed a PRT indicating a diagnosis of bipolar Disorder and OCD and a finding that the impairments were not severe. Dr. Goots agreed with Dr. Kuzniar and Dr. Capage that Santowasso would have only a mild (the earlier forms used the term "slight") restriction of activities of daily

living and difficulty in maintaining social functioning. He differed from Dr. Kuzniar, and indicated Santowasso would have only mild difficulties in maintaining concentration, persistence or pace, and with both State agency psychologists in noting no repeated episodes of decompensation, each of extended duration. Six months later, Dr. Capage agreed with Dr. Goots' PRT.

As noted, the ALJ determined that Santowasso had "mild" restrictions of activities of daily living, "moderate" difficulties in maintaining social functioning, "moderate" difficulties in maintaining concentration, persistence, or pace, and had experienced one or two episodes of decompensation. The ALJ fully explained his reasoning for the significant weight assigned to the State agency psychologists' opinions and the lesser degree of weight assigned to the treating psychologists' opinion and Dr. Hewitt's PRT. The ALJ also gave Santowasso the benefit of the doubt and determined a higher degree of impairment than had the State agency physicians.

The Magistrate Judge found that the ALJ did not substitute his own opinion for the opinions of the State agency psychologists and that his determination that Santowasso's impairments caused

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

slightly greater limitations than those assigned by the State agency psychologists was not a reversible error. The Court agrees.

## VII. <u>CONCLUSION</u>

Upon consideration of the plaintiff's objections, the Court concludes that Santowasso has not raised any issues that were not thoroughly considered by Magistrate Kaull in his report and recommendation. Moreover, upon an independent <u>de novo</u> consideration of all matters now before it, the Court is of the opinion that the Magistrate Judge's Opinion/Report and Recommendation accurately reflects the law applicable to the facts and circumstances in this action. Therefore, it is

**ORDERED** that Magistrate Kaull's Opinion/Report and Recommendation is accepted in whole and that this civil action be disposed of in accordance with the recommendation of the Magistrate. Accordingly,

1.   the defendant's motion for Summary Judgment (Docket No. 13) is **GRANTED**;

2.   the plaintiff's motion for Summary Judgment (Docket No. 10) is **DENIED**; and

### ORDER ADOPTING MAGISTRATE JUDGE'S
### REPORT AND RECOMMENDATION

3.   this civil action is **DISMISSED WITH PREJUDICE** and **RETIRED**

   from the docket of this Court.

The Clerk of Court is directed to enter a separate judgment

order. Fed.R.Civ.P. 58.

The Clerk of the Court is directed to transmit copies of this

Order to counsel of record.

DATED: September _____ *26* _____, 2005.

IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE